**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**GWENDOLYN WILLIAMS,**

**Plaintiff**

**vs.**

**PROCTER & GAMBLE COMPANY, THE PROCTER & GAMBLE MANUFACTURING COMPANY, WYETH PHARMACEUTICALS, INC., PFIZER INC., ABC CORPORATIONS, 1-10, the fictitious names for unknown companies and/or other business entities; JOHN DOES, 1-10, the fictitious names for unknown companies and/or other business entities; and JANE DOES, 1-10, the fictitious names for unknown companies and/or other business entities,**

**Defendants.**

**CIVIL ACTION NO.**

**COMPLAINT AND JURY DEMAND**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT

Gwendolyn Williams ("Plaintiff") by and through the undersigned attorneys, hereby submits this complaint and jury demand against The Procter & Gamble Company; The Procter & Gamble Manufacturing Company; Pfizer Inc.; And Wyeth Pharmaceuticals, Inc. ("Defendants").

As more specifically set forth below, Gwendolyn Williams maintains that Defendants' respective proton pump inhibitor drugs, Prilosec OTC and Protonix, are defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warning to the dangers associated with its use.

## INTRODUCTION

1. This is a personal injury action against Defendants, Procter & Gamble Co., Procter & Gamble Manufacturing Company, Pfizer Inc., Wyeth Pharmaceuticals, Inc., and their affiliates, subsidiaries, alter-egos, and/or joint-venturers who were responsible for designing, researching, developing, testing, manufacturing, packaging, labeling, marketing, promoting, distributing, and/or selling the proton pump inhibitor ("PPI"s), specifically Prilosec OTC and Protonix.

2. PPIs are used to reduce the production of acid in order to reduce the risk of duodenal ulcer recurrence and NSAID-associated gastric ulcers as well as to treat gastroesophageal reflux disease ("GERD") and certain pathological hypersecretory conditions including Zollinger-Ellison syndrome.

## PLAINTIFF

3. Plaintiff, Gwendolyn Williams, is a natural person, citizen, and domiciliary of Metairie, located in Jefferson Parish, Louisiana.

4. Plaintiff ingested PPIs as prescribed by her physician and/or directed by directions accompanying over the counter Prilosec.

5. Plaintiff began taking Protonix in 2006 and continued taking Protonix until 2008.

6. Thereafter, Plaintiff began to take Prilosec OTC starting in 2008 until April of 2016.

7. As result of using Defendants' PPIs, on April 28, 2016, Gwendolyn Williams, was diagnosed with Stage Three Chronic Kidney Disease at Daughters of Charity Medical Center.

8. Plaintiff's chronic kidney disease was caused by taking Defendants' PPIs, as a result, she has sustained severe and permanent personal injuries, pain, suffering, and emotional distress.

## DEFENDANTS

9. Defendant The Procter & Gamble Manufacturing Company is an Ohio corporation, which has its principal place of business at 1 Procter & Gamble Plaza, Cincinnati.

10. Defendant The Procter & Gamble Company is an Ohio corporation, which has its principal place of business at 1 Procter & Gamble Plaza, Cincinnati, OH 45202.

11. On information and belief, The Procter & Gamble Company is either the direct or indirect owner of substantially all the stock or other ownership interests of Procter & Gamble Manufacturing Company.

12. In doing the acts alleged herein, The Procter & Gamble Company and The Procter & Gamble Manufacturing Company were acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence, and ratification of each other (hereinafter The Procter & Gamble Company and Procter & Gamble Manufacturing Company are sometimes collectively referred to as "P&G").

13. Defendant Wyeth Pharmaceuticals, Inc. is incorporated under the laws of Delaware and has its principle lace of business in Pennsylvania.

14. Pfizer Inc. is incorporated under the laws of Delaware, and has its principle place of business in New York.

15. In 2009, Pfizer acquired Wyeth Pharmaceuticals, Inc.

16. On information and belief, Defendants have transacted and conducted business in the State of Kentucky, and/or contracted to supply goods and services within the State of Kentucky, and these causes of action have arisen from the same.

17. On information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America and the State of Kentucky.

18. On information and belief, at all relevant times, Defendants derived and derive substantial revenue from PPIs used in the State of Kentucky and from interstate commerce.

19. On information and belief, at all relevant times, Defendants committed tortious acts within the State of Kentucky causing injury within the State of Kentucky, out of which act(s) these causes of action arise.

20. At all times alleged herein, Defendants shall include any and all named or unnamed parent companies, parent corporations, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and any organizational units of any kind, their predecessors, successors, successors in interest, assignees, and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interests and costs, and because Defendants are all incorporated, have their principal places of business, or are otherwise at home in states other than the state in which the named Plaintiff resides.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in the Eastern District of Louisiana.

23. Because a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendants transact a substantial amount of business in this District, or Defendants otherwise have sufficient contacts with this District to justify it being fairly brought into this District, and Plaintiff resides in this District and was first injured in this District.

## SUMMARY OF THE CASE

24. This action is for damages brought on behalf of the Plaintiff, who was prescribed and took prescription and over the counter PPIs manufactured by Defendants. This action seeks, among other relief, general and special damages and equitable relief due to Plaintiff suffering severe and life threatening kidney injuries caused by Defendants' PPIs.

25. As a result of the defective nature of Defendants' PPIs, persons including Plaintiff, who ingested these products, are more likely to suffer from kidney injuries. These injuries include acute interstitial nephritis ("AIN"), acute kidney injuries ("AKI"), chronic kidney disease ("CKD") and total renal failure, also known as end-stage renal disease ("ESRD").

26. Defendants concealed and continue to conceal their knowledge of Defendants' PPIs unreasonably dangerous risks from Plaintiff, his physicians, other consumers, and the medical community. Specifically, Defendants failed to adequately inform consumers and the prescribing medical community about the magnified risk of kidney injuries related to the use of PPIs.

27. As a result of Defendants' actions and inactions, Plaintiff has CKD and reduced kidney function due to her ingestion of Defendants' PPIs, which caused and will continue to cause Plaintiff's injuries and damages. Plaintiff accordingly seeks damages associated with these injuries.

28. Prilosec OTC and Protonix are members of the proton pump inhibitor class of pharmaceuticals also known as PPIs.

29. PPIs irreversibly block the stomach's proton pump of acid producing parietal cells thereby suppressing gastrointestinal acid secretion.

30. In inhibiting the stomach's proton pump, PPIs cause inflammation of the kidneys' tubules resulting in an immunogenic injury to the kidney through haptenization, antigen mimicry, and/or neo-antigen formation.

31. The inflammation of the kidney tubules, also known as interstitial nephritis, is the cause of the vast majority of acute kidney injuries, and can lead to chronic kidney disease, the upstaging of chronic kidney disease, and end-stage renal disease requiring dialysis.

32. AstraZeneca had a patent for the drug Prilosec, which, by the year 2000, was the most widely prescribed drug in the world. By 2000, sales of Prilosec had reached $6 billion annually, making it the top selling drug in the world in terms of sales.

33. The patent for Prilosec was set to expire in 2001, and AstraZeneca anticipated that it would face stiff competition from generic manufacturers.

34. Procter & Gamble Co., in collaboration with Procter & Gamble Manufacturing Company and AstraZeneca Pharmaceuticals LP, designed and developed the proton pump inhibitor, Prilosec OTC.

35. In January, 2000, Procter & Gamble Co. submitted its first NDA for a Prilosec OTC product, NDA # 021229, also known as omeprazole to the FDA for approval to market Prilosec OTC in the United States.

36. In June 2003 the FDA approved Prilosec OTC, NDA #021229, for healing of erosive esophagitis, maintenance of healing erosive esophagitis, and treatment of GERD.

37. Procter & Gamble Co. is the holder of approved new drug applications ("NDAs") for Prilosec OTC (20 mg; delayed-release tablets), with NDA # 021229, approved on 6/20/2003.

38. P&G markets and sells Prilosec OTC with National Drug Code numbers 37000-459.

39. Wyeth-Ayerst Laboratories Inc., in collaboration with Wyeth Pharmaceuticals, Inc. designed and developed the proton pump inhibitor, Protonix.

40. In August, 1999 Wyeth-Ayerst Laboratories submitted its first NDA for a Protonix product, NDA # 020987, also known as pantoprazole, to the FDA for approval to market Protonix in the United States.

41. Wyeth-Ayerst Laboratories is the holder of an approved new drug applications ("NDAs") for the following form of Protonix:

a. Protonix (40mg; delayed-release tablets), with NDA #020987, approved on 2/20/2000;

b. Protonix IV (40 mg; injectable IV) , with NDA # 020988, approved on 3/22/2001;

c. Protonix (40 mg; oral suspension), with NDA #022020, approved on 11/14/2007.

42. Wyeth Pharmaceuticals, Inc. entities market and sell Protonix with National Drug Code numbers 0008-0841, 0008-0923 and 0008-0844.

43. In February, 2000 the FDA approved Protonix, NDA #020987, for the healing of erosive esophagitis, maintenance of healing erosive esophagitis, and treatment of GERD.

44. Materials including advertisements, press releases, web site publications, and other communications regarding PPIs are part of the labeling of the drug, and could be altered by the respective Defendants without prior FDA approval.

45. Defendants' marketing campaigns willfully and intentionally misrepresented the risks of their respective PPIs and failed to warn about the risks of AIN, AKI, CKD, and ESRD.

46. Defendants knew or should have known of the risks of AIN, AKI and CKD, and ESRD based on the data available to them or that could have been generated by them, including, but not limited to animal studies, mechanisms of action, pharmacodynamics, pharmacokinetics, pre-clinical studies, clinical studies, animal models, genetic models, analogous compounds, analogous conditions, adverse event reports, case reports, post-marketing reports, and regulatory authority investigations.

47. There are a multitude of studies that have been published linking the danger of long term PPI use with AIN and CKD including:

a. Lazarus et al., Proton Pump Inhibitor Use and the Risk of Chronic Kidney Disease, Jama International Medicine, at http://archinte.jamanetwork.com. (2016).

b. Xie et al., Proton Pump Inhibitors and Risk of Incident CKD and Progression to ESRD, Journal of the American Society of Nephrology. (2016)

c. Klepser et al., Proton pump inhibitors and acute kidney injury: a nested case–control study, BMC Nephrology, 14:150 (2014).

d. Antoniou T, Macdonald EM, Hollands S, et al. Proton pump inhibitors and the risk of acute kidney injury in older patients: a population-based cohort study. CMAJ Open. 2015; 3:E166–E171.

e. Blank ML, Parkin L, Paul C, et al. A nationwide nested case-control study indicates an increased risk of acute interstitial nephritis with proton pump inhibitor use. Kidney Int. 2014; 86:837–844.

f. Praga M, Gonzalez E. Acute interstitial nephritis. Kidney Int. 2010; 77: 956–961.

g. Perazella MA, Markowitz GS. Drug-induced acute interstitial nephritis. Nat Rev. Nephrol. 2010; 6:461–470.

h. Harmark L, van der Wiel HE, de Groot MC, et al. Proton pump inhibitor induced acute interstitial nephritis. Br J Clin Pharmacol. 2007; 64:819–823.

i. Brewster UC, Perazella MA. Proton pump inhibitors and the kidney: critical review. Clin Nephrol. 2007; 68:65–72.

48. Despite Defendants' knowledge of the increased risk of severe injury among PPI users, Defendants did not warn patients but instead continued to defend their respective PPIs, mislead physicians and the public, and minimize unfavorable findings.

49. Consumers of Prilosec OTC and Protonix, including Plaintiff and her physicians relied on Defendants' false representations and were misled as to the drug's safety, and as a result have suffered injuries including AKI, AIN, CKD, acute kidney failure, ESRD and the life-threatening complications thereof.

50. Consumers, including Plaintiff, have several alternative safer methods for treating GERD, including home remedies and other medication, including H2 antagonists.

51. As a result of the defective nature of PPIs, persons who ingested these PPIs, including Plaintiff, have suffered and may continue to suffer from kidney injuries including AIN, AKI, CKD and ESRD.

52. Defendants concealed and continue to conceal their knowledge of PPIs unreasonably dangerous risks from Plaintiff, her physicians, other consumers, and the medical community. Specifically, Defendants failed and continue to fail to adequately inform and warn consumers and the prescribing medical community about the magnified risk of kidney injuries related to the use of their respective PPIs.

53. As a result of Defendants actions and inactions, Plaintiff was injured due to her ingestion of Prilosec OTC and Protonix, which caused and will continue to cause Plaintiff's injuries and damages. Plaintiff accordingly seeks damages associated with these injuries and sequelae.

## FACTUAL ALLEGATIONS

54. Over 60 million Americans experience heartburn, a major symptom of GERD, at least once a month and some studies have suggested more than 15 million Americans experience heartburn on a daily basis.

55. About 21 million Americans used one or more prescription PPIs in 2009 accounting for nearly 20% of the drugs' global sales and earning an estimated $11 billion annually.

56. According to the 2012 National Health and Nutritional Examination Survey, 7.8% of US adults used prescription PPIs in every month.

57. Upon information and belief, from 2003 to the present, PPIs have been one of the top ten best-selling and most dispensed forms of prescription medication in the United States each year.

58. PPIs are one of the most commercially successful groups of medication in the United States. Upon information and belief, between the period of 2008 and 2013, prescription PPIs had a sale of over $50 billion with approximately 240 million units dispensed.

59. Defendants, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed, promoted, and sold PPIs including Protonix and Prilosec OTC.

60. In October of 1992, three years after the FDA's initial PPI approval, researchers from the University of Arizona Health Sciences Center led by Stephen Ruffenach published the

first article associating PPI usage with kidney injuries in The American Journal of Medicine, followed by years of reports from national adverse drug registries describing this association.

61. In 2006, researchers at the Yale School of Medicine conducted a case series published in the International Society of Nephrology's Kidney International finding that PPI use, by way of AIN, left most patients "with some level of chronic kidney disease."

62. In 2007, F. Sierra et al. published an article in the Journal of Alimentary Pharmacology and Therapeutics, titled, "Systematic review: proton pump inhibitor-associated acute interstitial nephritis." The researchers concluded that long term use of proton pump inhibitors is associated with interstitial nephritis.

63. In February 2007, Harmark et al. published an article in the British Journal of Clinical Pharmacology titled "Proton pump inhibitor-induced acute interstitial nephritis." The article states:

> *Our reports show that AIN can be induced by various PPIs. This assumption is supported by data from the World Health Organization Collaborating Centre for International Drug Monitoring in Uppsala, Sweden, where PPI-induced AIN is disproportionately present in the database. The reporting odds ratios are presented in Table 2. This databank contains more than 3.7 million spontaneous reports of adverse drug reactions from more than 80 countries worldwide. About 150 of these concern PPI-induced AIN, showing that this is a relatively rare condition.*

64. On August 23, 2011, Public Citizen, a consumer advocacy group, filed a petition with the FDA to add black box warnings and other safety information concerning several risks associated with PPIs including AIN.

65. According to the petition, at the time of its filing there was "no detailed risk information on any PPI for this adverse effect."

66. On October 31, 2014, more than three years after Public Citizen's petition, the FDA responded by requiring consistent labeling regarding risk of AIN on all prescription PPIs.

67. The FDA noted "that the prescription PPI labeling should be consistent with regard to this risk" and that "there is reasonable evidence of a causal association."

68. In December of 2014, the labels of prescription PPIs were updated to read:

> *Acute interstitial nephritis has been observed in patients taking PPIs including [Brand]. Acute interstitial nephritis may occur at any point during PPI therapy and is generally attributed to an idiopathic hypersensitivity reaction. Discontinue [PPI] if acute interstitial nephritis develops.*

69. The FDA did not require the consistent labeling regarding risk of AIN on over-the-counter PPIs.

70. In January of 2016, a study published in the Journal of the American Medical Association found that PPI use was independently associated with a 20 – 50% higher risk of CKD.

71. In February of 2016, a study published in the Journal of the American Society of Nephrology found that "exposure to PPI is associated with increased risk of development of CKD, progression of kidney disease, and risk of ESRD."

72. To date, over-the-counter PPIs lack detailed risk information for AIN.

73. To date, prescription and over-the-counter PPIs lack adequate risk information for AKI.

74. To date, prescription and over-the-counter PPIs lack detailed risk information for CKD including those manufactured by Defendants.

75. Parietal cells in the stomach lining secrete gastric juices containing hydrochloric acid to catalyze the digestion of proteins.

76. Excess acid secretion results in the formation of most ulcers in the gastroesophageal system and symptoms of heartburn and acid reflux.

77. PPIs irreversibly block the acidic hydrogen/potassium ATPase enzyme system (H+/K+ ATPase) of the gastric parietal cells, thereby halting the production of most hydrochloric acid.

78. In spite of their commercial success and global popularity, up to 70% of PPIs may be used inappropriately for indications or durations that were never tested or approved.

79. As a result of the defective nature of PPIs, even if used as directed by a physician or healthcare professional, persons who ingested PPIs, including Plaintiff, have been exposed to significant risks stemming from unindicated and/or long-term usage.

80. From these findings, PPIs and/or their metabolites – substances formed via metabolism – have been found to deposit within the spaces between the tubules of the kidney and act in such a way to mediate acute interstitial nephritis ("AIN"), a sudden kidney inflammation that can result in mild to severe problems.

81. PPI-induced AIN is difficult to diagnose with less than half of patients reporting a fever and, instead, most commonly complaining of non-specific symptoms such as fatigue, nausea, and weakness.

82. AIN's slow presentation can cause significant damage over time without those affected exhibiting acute symptoms.

83. PPI use may also lead to subclinical AIN according to multiple studies including but not limited to:

a. Lazarus B, Chen Y, Wilson FP, et al. Proton pump inhibitor use and the risk of chronic kidney disease. JAMA Intern Med. 2016;176:238–246

b. Moledina DG, Perazella MA. Proton pump inhibitors and CKD. J Am Soc Nephrol. 2016; 27:2926–2928.

84. Where AIN or AKI is subclinical, it can persist for months before a patient realizes their injury. By that time, their untreated AIN or AKI can lead to CKD and ESRD.

85. PPI-induced AIN exclusively affects the kidney's interstitial tissue, rather than the kidney's glomeruli, as seen is non-PPI induced kidney injury.

86. Unlike many forms of AIN, PPI-induced AIN results in an excess of white blood cells in the urine, indicating an immunological response.

87. In April 2016, a study published in the Journal of Nephrology suggested that the development of and failure to treat AIN could lead to chronic kidney disease and end-stage renal disease, which requires dialysis or kidney transplant to manage.

88. Analyses of the study were adjusted for age, sex, race, baseline eGFR, cigarette smoking, BMI, systolic blood pressure, diabetes, a history of cardiovascular disease, antihypertensive medication use, anticoagulant medication use, statin, aspirin, NSAID use. Across all groups, "each of these sensitivity analyses showed a consisted association between PPI use and a higher risk of CKD."

89. CKD describes a slow and progressive decline in kidney function that may result in ESRD. As the kidneys lose their ability to function properly, wastes can build to high levels in the blood resulting in numerous, serious complications ranging from nerve damage and heart disease to kidney failure and death.

90. Prompt diagnosis and rapid withdrawal of the offending agent are key in order to preserve kidney function. While AIN can be treated completely, once it has progressed to CKD it is incurable and can only be managed, which, combined with the lack of numerous early-onset symptoms, highlights the need for screening of at-risk individuals.

91. PPIs have also been shown to cause CKD independent of and in the absence of an intervening AKI or AIN event, even where the AKI or AIN is subclinical.

92. Xie, Yan, et al. Long-Term Kidney Outcomes among Users of Proton Pump inhibitors without Intervening Acute Kidney Injury, shows a significant association of PPI use and CKD in the absence of AKI.

93. The results of the Xie study "showed a significant association between PPI use and chronic renal outcomes including incident CKD, CKD progression, and ESRD in the absence of intervening AKI."

94. Consumers, including the Plaintiff, who have used PPIs including Protonix and Prilosec OTC for the treatment of increased gastric acid have and had several alternative safer treatments available and have not been adequately warned about the significant risks and lack of benefits associated with Protonix and Prilosec OTC therapy.

95. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff and her physicians the true and significant risks associated with the use of Protonix and Prilosec OTC.

96. Defendants concealed and continue to conceal their knowledge that Protonix and Prilosec OTC can cause kidney injuries from Plaintiff, other consumers, and the medical community. Specifically, Defendants have failed to adequately inform consumers and the prescribing medical community against the serious risks associated with Protonix and Prilosec OTC and completely failed to warn against the risk of CKD and ESRD to this day.

97. As a result of Defendants' actions and inactions, Plaintiff was injured due to her ingestion of Protonix and Prilosec OTC, which caused and will continue to cause Plaintiff various injuries and damages. Plaintiff accordingly seeks damages associated with these injuries.

98. As a result of Defendants' actions, Plaintiff and her prescribing physicians were unaware, and could not have reasonably known or have learned through reasonable diligence,

that Plaintiff had been exposed to the risks identified in this Complaint, and that those risks were the direct and proximate result of Defendants' acts, omissions, and misrepresentations.

99. As a direct result of ingesting Protonix and Prilosec OTC, Plaintiff has been permanently and severely injured, having suffered serious consequences from Protonix and Prilosec OTC use. Plaintiff requires and will in the future require ongoing medical care and treatment.

100. Plaintiff, as a direct and proximate result of Protonix and Prilosec OTC suffered severe mental and physical pain and suffering and has and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses, and living related expenses due to her new lifestyle.

101. Plaintiff would not have used Protonix and Prilosec OTC had Defendants properly disclosed the risks associated with long-term use.

102. Defendants had an obligation to comply with the law in the manufacture, design, and sale of Protonix and Prilosec OTC.

103. Upon information and belief, Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, et seq.

104. With respect to Protonix and Prilosec OTC, Defendants, upon information and belief, has or may have failed to comply with all federal standards applicable to the sale of prescription drugs including, but not limited to, one or more of the following violations:

a. Protonix and Prilosec OTC are adulterated pursuant to 21 U.S.C. § 351 because, among other things, it fails to meet established performance standards, and/or the methods, facilities, or controls used for its manufacture, packing, storage or Installation is not in conformity with federal requirements. See, 21 U.S.C. § 351.

b. Protonix and Prilosec OTC are adulterated pursuant to 21 U.S.C. § 351 because, among other things, its strength differs from or its quality or purity falls below the standard set forth in the official compendium for PPIs and such deviations are not plainly stated on their labels.

c. Protonix and Prilosec OTC are misbranded pursuant to 21 U.S.C. §352 because, among other things, it's labeling is false or misleading.

d. Protonix and Prilosec OTC are misbranded pursuant to 21 U.S.C. §352 because words, statements, or other information required by or under authority of chapter 21 U.S.C. § 352 are not prominently placed thereon with such conspicuousness and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

e. Protonix and Prilosec OTC are misbranded pursuant to 21 U.S.C. §352 because the labeling does not bear adequate directions for use, and/or the labeling does not bear adequate warnings against use where its use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as are necessary for the protection of users.

f. Protonix and Prilosec OTC are misbranded pursuant to 21 U.S.C. §352 because it's dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

g. Protonix and Prilosec OTC do not contain adequate directions for use pursuant to 21 CFR § 201.5, because, among other reasons, of omission, in whole or in part, or incorrect specification of (a) statements of all conditions, purposes, or uses for which it is intended, including conditions, purposes, or uses for which it is prescribed, recommended or suggested in their oral, written, printed, or graphic advertising, and

conditions, purposes, or uses for which the drugs are commonly used, (b) quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and different physical conditions, (c) frequency of administration or application, (d) duration or administration or application, and/or (d) route or method of administration or application.

h. Defendants violated 21 CFR § 201.56 because the labeling was not informative and accurate.

i. Protonix and Prilosec OTC are misbranded pursuant to 21 CFR § 201.56 because the labeling was not updated as new information became available that caused the labeling to become inaccurate, false, or misleading.

j. Defendants violated 21 CFR § 201.57 because they failed to identify specific tests needed for selection or monitoring of patients who took Protonix and Prilosec OTC.

q. Protonix and Prilosec OTC are mislabeled pursuant to 21 CFR § 201.57 because the labeling does not state the recommended usual dose, the usual dosage range, and, if appropriate, an upper limit beyond which safety and effectiveness have not been established.

r. Protonix and Prilosec OTC violate 21 CFR § 210.1 because the process by which it was manufactured, processed, and/or held fails to meet the minimum current good manufacturing practice of methods to be used in, and the facilities and controls to be used for, the manufacture, packing, or holding of a drug to assure that it meets the requirements as to safety and have the identity and strength and meets the quality and purity characteristic that they purport or are represented to possess.

s. Protonix and Prilosec OTC violate 21 CFR § 210.122 because the labeling and packaging materials do not meet the appropriate specifications.

t. Protonix and Prilosec OTC violate 21 CFR § 211.165 because the test methods employed by Defendants are not accurate, sensitive, specific, and/or reproducible and/or such accuracy, sensitivity, specificity, and/or reproducibility of test methods have not been properly established and documented.

u. Protonix and Prilosec OTC violate 21 CFR § 211.165 in that they fail to meet established standards or specifications and any other relevant quality control criteria.

v. Defendants violate 21 CFR § 211.198 because the written procedures describing the handling of all written and oral complaints regarding Protonix and Prilosec OTC were not followed.

w. Protonix and Prilosec OTC violate 21 CFR § 310.303 in that Protonix and Prilosec OTC is not safe and effective for its intended use.

x. Defendants violated 21 CFR § 310.303 because the Defendants failed to establish and maintain records and make reports related to clinical experience or other data or information necessary to make or facilitate a determination of whether there are or may be grounds for suspending or withdrawing approval of the application to the FDA.

y. Defendants violated 21 CFR §§310.305 and 314.80 by failing to report adverse events associated with Protonix and Prilosec OTC as soon as possible or at least within 15 days of the initial receipt by the Defendants of the adverse drugs experience.

z. Defendants violated 21 CFR §§310.305 and 314.80 by failing to conduct an investigation of each adverse event associated with Protonix and Prilosec OTC, and evaluating the cause of the adverse event.

aa. Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to promptly investigate all serious, unexpected adverse drug experiences and submit follow-up reports within

the prescribed 15 calendar days of receipt of new information or as requested by the FDA.

bb. Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to keep records of the unsuccessful steps taken to seek additional information regarding serious, unexpected adverse drug experiences.

cc. Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to identify the reports they submitted properly, such as by labeling them as “15-day Alert report,” or “15-day Alert report followup.”

dd. Defendants violated 21 CFR § 312.32 because they failed to review all information relevant to the safety of Protonix and Prilosec OTC or otherwise received by the Defendants from sources, foreign or domestic, including information derived from any clinical or epidemiological investigations, animal investigations, commercial marketing experience, reports in the scientific literature, and unpublished scientific papers, as well as reports from foreign regulatory authorities that have not already been previously reported to the agency by the sponsor.

ee. Defendants violated 21 CFR § 314.80 by failing to provide periodic reports to the FDA containing (a) a narrative summary and analysis of the information in the report and an analysis of the 15-day Alert reports submitted during the reporting interval, (b) an Adverse Reaction Report for each adverse drug experience not already reported under the Post marketing 15-day Alert report, and/or (c) a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated).

ff. Defendants violated 21 CFR § 314.80 by failing to submit a copy of the published article from scientific or medical journals along with one or more 15-day Alert reports based on information from the scientific literature.

105. Defendants failed to meet the standard of care set by the above statutes and regulations, which were intended for the benefit of individual consumers such as the Plaintiff.

**ESTOPPEL FROM PLEADING, TOLLING OF APPLICABLE PRESCRIPTION PERIOD AND THE DELAYED DISCOVERY RULE**

106. The running of any statute of limitation has been tolled by reason of the Defendants' conduct. The Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's treating physicians the true risks associated with PPIs.

107. Plaintiff filed her claims within the applicable statute of limitations. However, to the extent Defendants assert otherwise, any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts by Defendants, as alleged herein.

108. As a result of the Defendants' actions and omissions, Plaintiff and Plaintiff's treating physicians were unaware, and could not reasonably know or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

109. Furthermore, the Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of PPIs. The Defendants were under a duty to disclose the true character, quality and nature of PPIs because this was non-public information that the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to the Plaintiff, their medical providers, and/or to their health facilities.

110. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable drug, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

111. Plaintiff is not an expert in the field of nephrology, epidemiology, or regulation and has never attended medical school.

112. At no point has Plaintiff ever been employed as a health care professional in any capacity, be that as a doctor, physician's assistant, registered nurse, emergency medical technician, pharmacy technician, clinical laboratory technician, nurse practitioner or veterinarian, , etc.

113. At the time of Plaintiff's injury, Plaintiff and Plaintiff's healthcare providers were not aware of any facts which would have made a reasonably prudent person suspicious of Defendants' wrongdoing because Plaintiff and Plaintiff's healthcare providers reasonably relied on Defendants' representations that PPIs do not cause kidney injury.

114. Plaintiff diligently sought medical care at Daughters of Charity Medical Center in Metairie, Louisiana. At no point, however, medical providers ever indicate or suggest that PPI in any way caused, or were a substantial factor between PPIs and Plaintiff's chronic kidney disease.

115. To this day, Plaintiff has required frequent and regular batteries of kidney screenings to monitor her kidney function.

116. At no time prior to Plaintiff's eventual discovery of wrongdoing, did any of Plaintiff's doctors ever inform, advise, suggest or otherwise imply that Protonix and Prilosec OTC was a potential contributing cause of Plaintiff's chronic kidney disease.

117. Plaintiff reasonably relied on the skill and judgment of Plaintiff's doctors and had no reason to further investigate, inquire into or suspect Protonix and Prilosec OTC caused Plaintiff's condition.

118. Plaintiff exercised reasonable diligence in an attempt to discover the cause of her kidney injury. Plaintiff relied on her physicians to advise her of any known complications. Plaintiff had no reason to believe her injuries were the result of any wrongdoing, whether intentional and/or negligent, until the discovery dates suggested below and is therefore relying on the benefit of the discovery rule.

119. The Plaintiff had neither knowledge nor reason to suspect that the Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendants, the Plaintiff could not have reasonably discovered the wrongdoing at the time of her injury.

120. The Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable pharmaceutical drug, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on only the Defendants' representations.

121. Because of Defendants' refusal to conduct appropriate studies to determine the safety of continuous PPI use on users' kidneys, and because of their failure to apprise physicians of information they held secretive within their companies, Plaintiff was deprived of evidence of a causal connection between her injuries and Defendants' PPIs and Defendants' negligent acts and omissions.

122. At the time of Plaintiff's injury, Plaintiff did not have access to, or actually receive any studies or information recognizing the increased risk of kidney injuries with Proton Pump Inhibitor use or have any discussions with her Doctor that there was an association between her chronic kidney disease and PPI use.

123. Plaintiff was not aware of the connection between the use of Protonix and Prilosec OTC and kidney injuries until July of 2016, when Plaintiff saw a television commercial identifying the link between Proton pump inhibitors (including Protonix and Prilosec OTC prescribed and taken over the counter by Plaintiff) and kidney disease.

124. At the time of Plaintiff's injuries and in the exercise of reasonable diligence, Plaintiff could not have discovered that their chronic kidney disease was caused by PPIs. At the time of her injury, Plaintiff did not have the means, knowledge, experience, or access necessary to infer that PPIs were the proximate cause of her kidney injuries.

125. Plaintiff could not have made an earlier discovery despite her reasonable diligence because of the knowing and active concealment and denial of the facts by Defendants, as alleged herein. Plaintiff and her healthcare providers were deprived of vital information essential to the pursuit of these claims, through no fault or lack of diligence on their part. Plaintiff could not reasonably have discovered the dangerous nature of, and the unreasonable adverse side effects associated with continuous PPI use.

126. Plaintiff's statute of limitations is further tolled as a result of Defendants' intentional and deliberate efforts to withhold from the FDA, healthcare community, Plaintiff's physicians and Plaintiff the known or knowable cause and/or potential association between Defendants' Protonix and Prilosec OTC and the risk of developing kidney injuries including AKI, AIN, CKD, and ESRD. Defendants are and were under a continuing duty to disclose the true character, quality and nature of its products to patients and healthcare providers. Because of

Defendants' concealment of the true character, quality and nature of Protonix and Prilosec OTC, Defendants are estopped from relying on any statute of limitations defense.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, La. R.S. § 51:1401, et seq.

127. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

128. The Plaintiff pleads this Count in the broadest sense available under law to include pleading same pursuant to all substantive law that applies to this case as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

129. The Plaintiff used Defendants' PPIs and suffered ascertainable losses as a result of the Defendants' actions in violation of the aforementioned consumer protection laws.

130. Defendants violated the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. §51:1401, et seq, through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Proton Pump Inhibitors.

131. Defendants uniformly communicated the purported benefits of Proton Pump Inhibitors while failing to disclose the serious and dangerous side effects related to the use of Proton Pump Inhibitors and of the true state of Proton Pump Inhibitor's regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers, such as the Plaintiff, in the marketing and advertising campaign described herein.

132. Defendants used unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

a. Representing that goods or services have characteristics, ingredients, uses, benefits, or qualities that they do not have;

b. Advertising goods or services with the intent not to sell them as advertised; and,

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

133. Defendants have a statutory duty to refrain from unfair trade practices in the design, development, manufacture, promotion and sale of Proton Pump Inhibitors.

134. Had Defendants not engaged in the deceptive conduct described herein, the Plaintiff would not have purchased and/or paid for Proton Pump Inhibitors, and would not have incurred related medical costs. Specifically the Plaintiff, the Plaintiff's physicians and other Healthcare Professionals were misled by the deceptive conduct described herein.

135. Defendants' deceptive, unconscionable, false, misleading and/or fraudulent representations and material omissions to patients, physicians and consumers, including the Plaintiff, of material facts relating to the safety of Proton Pump Inhibitors constituted unfair trade practices in violation of the state consumer protection statutes listed above.

136. Defendants uniformly communicated the purported benefits of Proton Pump Inhibitors while failing to disclose the serious and dangerous side effects related to the use of Proton Pump Inhibitors and the true state of Proton Pump Inhibitor's regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers, such as the Plaintiff, in the marketing and advertising campaign described herein.

137. Defendants' conduct in connection with Proton Pump Inhibitors was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy, and advantages of Proton Pump Inhibitors.

138. By reason of wrongful acts engaged in by Defendants, the Plaintiff suffered ascertainable loss and damages for which the Plaintiff is now entitled to recover.

139. As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff was damaged by paying in whole or in part for Proton Pump Inhibitors and for the Plaintiff's medical treatment. Plaintiff is now entitled to recover those damages.

140. As a direct and proximate result of Defendants' violations of unfair trade practices, the Plaintiff sustained economic losses and other damages for which the Plaintiff is entitled to statutory and compensatory damages and attorneys' fees, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**LOUISIANA PRODUCTS LIABILITY ACT (DESIGN DEFECT AND FAILURE TO WARN)**

141. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

142. Defendants designed, developed, researched, tested, licensed, manufactured, packaged, labeled, promoted, marketed, sold, and distributed PPIs in a defective and unreasonably dangerous condition, including Protonix and Prilosec OTC used by Gwendolyn Williams. The design defect made PPIs more dangerous than an ordinary consumer would expect and more dangerous than other drugs used to treat GERD.

143. PPIs' inadequate warnings rendered it unreasonably dangerous and defective.

144. Defendants' defective warnings for PPIs were reckless, willful, wanton, fraudulent, malicious, and done with reckless disregard for the health and safety of users of PPIs. Defendants made conscious decisions not to adequately warn about risks they know or should have known about. Defendants' reckless conduct warrants an award of punitive damages. Defendants' conduct was motivated by greed and the intentional decision to value profits over the safety and well-being of the consumers of PPIs.

145. Gwendolyn Williams was prescribed and used PPIs for its intended purposes and for purposes that Defendants expected and could foresee.

146. Defendants expected and intended Prilosec OTC and Protonix to reach, and did in fact reach, Gwendolyn Williams without any substantial change in the condition of the product from when it was initially manufactured by P&G and Wyeth Pharmaceuticals Inc, respectively.

147. Gwendolyn Williams could not have discovered the unwarned risks of using Protonix or Prilosec OTC through the exercise of reasonable care.

148. Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that the warnings and other relevant information and data which they distributed regarding the risks of injuries and death associated with the use of PPIs were incomplete and inadequate.

149. Gwendolyn Williams did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to Gwendolyn Williams or to her treating physicians. The warnings that were given by Defendants were not accurate and were incomplete.

150. Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, supply, warn, and take other such steps as

necessary to ensure that PPIs did not cause users to suffer from unreasonable and dangerous risks.

151. Defendants knew or should have known that the limited warnings disseminated with PPIs were inadequate, but they failed to communicate adequate information on the dangers and safe use of its product, taking into account the characteristics of and the ordinary knowledge common to physicians who would be expected to prescribe the drug. In particular, Defendants failed to communicate warnings and instructions to doctors that were appropriate and adequate to render the product safe for its ordinary, intended, and reasonably foreseeable uses, including the common, foreseeable, and intended use of the product for treatment of GERD.

152. As a direct and proximate cause of Defendants' manufacture, sale and promotion of the defectively designed drug and failure to warn Gwendolyn Williams and her physicians about the significant risks inherent in PPI therapy, Gwendolyn Williams sustained severe injuries.

153. Defendants expressly warranted to Plaintiff's physicians and Plaintiff by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts, marketing, and other written materials intended for physicians and the public that PPIs are safe, effective, fit and proper for its intended use, of merchantable quality, had been adequately tested, contained adequate warnings, and was effective.

154. PPIs' "Warnings and Precautions" sections prescribing information purports to expressly describe the relevant and material side-effects that Defendants knew or should have known about.

155. Gwendolyn Williams's physician prescribed PPIs and Gwendolyn Williams consumed PPIs reasonably relying on these warranties. Gwendolyn Williams also took over the

counter PPIs and reasonably relied on the warranties accompanying the PPI. Gwendolyn Williams and her physician could not have learned independently that Defendants' representations, labels, warnings, direct to consumer marketing, express and implied warranties were false and misleading.

156. Defendants knew or should have known Gwendolyn Williams would rely on their warranties.

157. Plaintiff reasonably relied on the skill, judgment, representations, and foregoing express warranties of Defendants.

158. The warranties and representations were false. PPIs can cause acute interstitial nephritis, chronic kidney disease, and end stage renal disease.

159. PPIs did not conform to Defendants' express representations; therefore, Defendants have breached their express warranties.

160. The breach of express warranties by Defendants was a foreseeable, direct, and proximate cause of Gwendolyn Williams's injuries and damages.

161. Plaintiff's damages were caused by characteristics of Proton Pump Inhibitors manufactured by the Defendants that rendered the Proton Pump Inhibitors unreasonably dangerous after a reasonably anticipated use of the products by Plaintiff making Defendants liable to Plaintiff pursuant to LSA R.S. 9:2800.54.

162. Proton Pump Inhibitors are unreasonably dangerous under the following:

a. It is unreasonably dangerous in construction or composition as per LSA R.S. 9:2800.55;

b. It is unreasonably dangerous in design as per LSA R.S. 9:2800.56.

c. It is unreasonably dangerous because an accurate warning about the product was not provided as required by LSA R.S. 9:2800.57.

d. It is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as per LSA R.S. 9:2800.58.

163. The characteristics of PPIs that render it unreasonably dangerous under LSA R.S. 9:2800.55, LSA R.S. 9:2800.56, and LSA R.S. 9:2800.57 et seq. existed at the time the product left the control of the manufacturers.

164. For all of the reasons alleged herein, PPIs were unreasonably dangerous in design at the time the products left the manufacturers' control in that:

a. There existed an alternate design for the product that was capable of preventing the Plaintiff's damages; and

b. The likelihood that the product's design would cause the Plaintiff's damages and the gravity of those damages outweigh the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

165. For all of the reasons alleged herein, PPIs were unreasonably dangerous because an adequate warning about the product had not been provided and at the time the product left the manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide adequate warnings that such characteristic and its dangers to users of the product.

166. Further, Defendants, before, during, and after the product left its control, acquired knowledge of the characteristic of the product that may cause damage and the danger of such characteristic (or, alternatively, Defendants would have acquired such knowledge if it had acted as reasonable prudent manufacturers), and thus are liable for damages suffered by Plaintiff which

arose as a consequence of Defendants' failure to use reasonable care to provide an adequate warning of such characteristic and its dangers to users.

167. Defendants expressly warranted to the market, including Plaintiff, by and through statements made by Defendants or its authorized agents or sales representatives, orally and in publications, package inserts, advertisements and other materials to the health care and general community, that Proton Pump Inhibitors were safe, effective, fit and proper for its intended use.

168. In using PPIs, Defendants and her physicians relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations proved to be false because the product was not safe and was unfit for the uses for which it was intended.

## THIRD CAUSE OF ACTION
## REDHIBITION

169. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

170. The subject product contains a vice or defect which renders it useless or its use so inconvenient that buyers would not have purchased it.

171. Defendants sold and promoted PPIs, which Defendants placed into the stream of commerce. Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520. The subject product sold and promoted by Defendants, possesses a redhibitory defect because it was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which renders the subject product useless or so inconvenient that it must be presumed that a buyer would not have bought the subject product had he known of the defect. Pursuant to La. C.C. art. 2520, Plaintiff is entitled to obtain a rescission of the sale of the subject product.

172. The subject product alternatively possesses a redhibitory defect because the subject product was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which diminishes the value of the subject product so that it must be presumed that a buyer would still have bought it but for a lesser price. In this instance, Plaintiff is entitled to a reduction of the purchase price.

173. Defendants are liable as bad faith sellers for selling a defective product with knowledge of the defect, and thus, is liable to Plaintiff for the price of the subject product, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the subject product, and attorneys' fees. As the manufacturer of the subject product, under Louisiana law, Defendants are deemed to know that Proton Pump Inhibitors possessed a redhibitory defect. La. C.C. art. 2545.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTIES UNDER LA. CC. ART. 2524

174. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

175. In addition to warranting against redhibitory defects, Defendants warranted that the subject product is reasonably fit for its ordinary and intended use. La. C.C. art. 2524.

176. The subject product is not safe, has numerous and serious side effects and causes severe and permanent injuries including, but not limited to, acute interstitial nephritis ("AIN"), acute kidney injuries ("AKI"), chronic kidney disease ("CKD") and renal failure, also known as end-stage renal disease ("ESRD").

177. As a direct and proximate result of Defendants' actions, Plaintiff has sustained serious, significant and permanent injuries including but not limited to Chronic Kidney Disease, Kidney Failure and related sequelae. In addition, Plaintiff required and will continue to require

healthcare and services as a result of her injury. Plaintiff has incurred and will continue to incur medical and related expenses as a result of her injury. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain.

## PUNITIVE DAMAGES ALLEGATIONS

178. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights, health and safety of Gwendolyn Williams and other Protonix and Prilosec OTC users and for the primary purpose of increasing Defendants' profits from the sale and distribution of Protonix and Prilosec OTC. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

179. Prior to the manufacturing, sale, and distribution of Protonix and Prilosec OTC, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or kidney failure from using Protonix and Prilosec OTC.

180. Despite their knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Protonix and Prilosec OTC and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Protonix and Prilosec OTC. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Protonix and Prilosec OTC knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

181. Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of, entitling Plaintiff to exemplary damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, as follows:

a. Awarding actual damages to the Plaintiff incidental to her purchase and use of Proton Pump Inhibitors in an amount to be determined at trial;

b. Awarding pre-judgment and post-judgment interest to the Plaintiff;

c. Awarding the costs and the expenses of this litigation to the Plaintiff;

d. Awarding reasonable attorneys' fees and costs to the Plaintiff as provided by law; and

e. Granting all such other relief as the Court deems necessary, just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, Gwendolyn Williams hereby demands a trial by jury on all counts and as to all issues.

Date: April 25, 2017

Respectfully submitted by,

**GAINSBURGH, BENJAMIN,**
**DAVID, MEUNIER & WARSHAUER, LLC**

*/s/M. Palmer Lambert*
**GERALD E. MEUNIER (LA Bar No. 9471)**
**MICHAEL J. ECUYER (LA Bar No. 23050)**
**M. PALMER LAMBERT (LA Bar No. 33228)**
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Telephone: (504) 522-2304
Facsimile: (504) 528-9973
Email: gmeunier@gainsben.com
Email: mecuyer@gainsben.com
Email: plambert@gainsben.com

**OF COUNSEL:**

**WEITZ & LUXENBERG, P.C.**

Paul J. Pennock
700 Broadway
New York, New York 10003
Telephone: (212) 558-5500
Facsimile: (212) 363-2721
Email: ppennock@weitzlux.com